John SCIOTTO and Catherine P. Sciotto on behalf of Louis Sciotto, a Minor, as his parents and natural guardians, Plaintiffs,

v.

MARPLE NEWTOWN SCHOOL DISTRICT, James Smith, Stu Nathans, and Greg Fendler, Defendant.

No. CIV. A. 98–2768.

United States District Court,
E.D. Pennsylvania.

Sept. 23, 1999.

James J. Byrne, Jr., Robert E.J. Curran, Curran & Byrne, P.C., Media, PA, for plaintiffs.

Derek B. Eddy, Bennett, Bricklin & Saltzbyrg, Philadelphia, PA, Phillip B. Silverman, Harris & Silverman, Philadelphia, PA, Joseph T. Bodell, Jr., Louis A. Bove, Chrystale B. Conwell, Bodell, Bove and Van Horn, Philadelphia, PA, Michael I. Levin, Michael I. Levin and Assoc., Huntingdon Valley, PA, Mark A. Sereni, David C. Zimmaro, Diorio and Sereni, LLP, Media, PA, for Marple Newtown School Dist., defendant.

Robert G. Hanna, Jr., Marshall, Dennehey, Warner, Coleman & Goggin, Harrisburg, PA, Thomas E. Butler, Jr., Butler & McNamara, PC, Philadelphia, PA, for James Smith, defendant.

Joseph M. Fullem, Jr., Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, PA, John A. Orlando, White & Williams, Philadelphia, PA, for Stu Nathans, defendant.

Israel N. Eisenberg, Post and Schell, P.C., Philadelphia, PA, Joel I. Fishbein, Bennett, Bricklin & Saltzburg, Philadelphia, PA, for Greg Fendler, defendant.

## MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Before the Court are the respective motions of defendants Marple Newtown School District ("the school district") (Document No. 76), James Smith ("Smith") (Document No. 66), Stu Nathans ("Nathans") (Document No. 77) (collectively, "the school defendants"), and Greg Fendler ("Fendler") (Document No. 74) for summary judgment on the claims of plaintiff Louis Sciotto, by and through his parents and natural guardians, John Sciotto and Catherine P. Sciotto. Based on the following reasons, the motions will be considered in an omnibus fashion and will be denied.

**1.** Fendler was a non-scholarship, "walk-on" wrestler at Penn State and was no longer a member of Penn State's wrestling team on January 10, 1997.

## I. BACKGROUND

The following facts are based on the evidence presented to the Court in support of defendants' motions for summary judgment and plaintiffs' response (which consist primarily of depositions taken of defendants, plaintiff, and witnesses). All inferences have been taken in favor of plaintiffs, the non-moving parties.

On January 10, 1997, Greg Fendler, an alumnus of Marple Newtown High School and former member of the high school wrestling team, attended a Marple Newtown High School wrestling practice at the invitation of head coach Stu Nathans. (Smith's Exh. D, Fendler Deposition, at 41–42). Fendler's attendance was in keeping with a "longstanding tradition" at Marple Newtown High School in which alumni members of the wrestling team returned to participate in wrestling practices following their graduations. (Smith's Exhibit F, Smith Deposition, at 19–20; Exhibit G, Nathans Deposition, at 51–52). Nathans, Smith, and members of the school district's Board of School Directors were aware of this tradition. (Id.; Smith's Exhibit H, J. Leon Deposition, at 10; Plaintiff's Exhibit B, Price Deposition, at 29). The practice has since been formally discontinued by the school district. (Smith's Exhibit H, J. Leon Deposition, at 74–76).

At the beginning of the January 10 wrestling practice, Nathans introduced Fendler to the wrestling team, correctly informing the team that after graduating from high school, Fendler had gone on to become a member of the Division–I wrestling team at Pennsylvania State University at State College, Pennsylvania.[1] At the time he attended the high school's wrestling practice, Fendler was 22 years old and weighed approximately 145–150 pounds. (Smith's Exh. D, Fendler Deposition, at 37). During the practice, Fendler demonstrated moves, instructed wrestlers, and engaged in "live wrestling"[2] with

**2.** "Live wrestling" was defined by Fendler as "[j]ust like you're wrestling in a match." (Smith's Exh. D, Fendler Deposition, at 23).

members of the team. (Smith's Exh. D, Fendler Deposition, at 52–62).

One of the team members Fendler "live wrestled" was Louis Sciotto, a 16–year–old sophomore then weighing 110 pounds. (Smith's Exh. E, Sciotto Deposition, at 17). During the contest, Fendler executed a legal wrestling move called a "half-nelson." (Smith's Exh. D, Fendler Deposition, at 72). As he was "running the half" (*Id.* at 73), Fendler "heard a pop." (*Id.* at 82). Wrestling ceased, and Louis Sciotto said, "I can't feel my legs." (*Id.*). It was reliably determined that Sciotto had thereby sustained an injury to his spinal cord that has rendered him a quadriplegic. (Plaintiff's Exhibit F, Letter from Christopher Formal, M.D.). His arms, legs, and diaphragm are permanently paralyzed, and he now breathes with the assistance of a ventilator. (*Id.*)

Plaintiffs filed a complaint against the school defendants pursuant to 42 U.S.C. § 1983 for deprivation of Louis Sciotto's right to bodily integrity under the Due Process Clause of the Fourteenth Amendment, and against Greg Fendler for assault and battery and negligence under Pennsylvania state law. On February 9, 1999, this court denied the motion of the school district, Nathans, and Smith to dismiss plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Sciotto v. Marple Newtown Sch. Dist.*, No. 98–2768, 1999 WL 79136 (E.D.Pa. Feb. 9, 1999).

The school defendants now move for summary judgment on the grounds that plaintiffs have failed to present sufficient evidence upon which jury could find that the elements of the "state-created danger" theory of liability under § 1983 are met, and that they are entitled to judgment as a matter of law. Furthermore, the school district argues that plaintiffs have not established municipal liability, and Nathans and Smith assert a defense of qualified immunity. Defendant Fendler asserts that the plaintiffs have failed to present sufficient evidence that a reasonable jury could find he possessed the requisite intent to prove he committed assault and battery, and claims immunity as an employee under Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8501, et seq.

## II. SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then a motion for summary judgment must be granted. The proper inquiry on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must then "go beyond the pleadings and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548.

In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences therefrom in favor of the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## III. ANALYSIS

### A. Section 1983 Claims

The school defendants assert that they are entitled to summary judgment both on the facts of the case and as a matter of law. They argue that (1) that the "state-created danger" theory under which Louis Sciotto asserts a constitutional violation is not viable, Memorandum of Law of Defendant Marple Newtown School District in Support of Its Motion for Summary Judgment, at 18–19 (filed April 30, 1999) (hereinafter School District's Memo); and (2) that the evidence produced by the plaintiffs fails to satisfy the elements of that theory, Brief of Defendant Stuart Nathans in Support of His Motion for Summary Judgment, at 21–29 (filed April 30, 1999) (hereinafter Nathans' Brief).[3] The school district further argues that plaintiffs have not established municipal liability under § 1983, see School District's Memo, at 26, and Nathans and Smith assert a defense of qualified immunity, see Nathans' Brief, at 29; Memorandum of Law in Support of Defendant James Smith's Motion for Summary Judgment (filed April 12, 1999) (hereinafter Smith's Memo), at 17.

### 1. "State–Created Danger" Theory[4]

█ Plaintiffs contend that the "state-created danger" theory of liability applies.

See *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir.1994), *cert. denied*, 514 U.S. 1017, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995). ("When state actors knowingly place a person in danger, the due process clause of the constitution has been held to render them accountable for the foreseeable injuries that result from their conduct whether or not the victim was in formal state custody."). See also *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), *cert. denied*, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *Cornelius v. Town of Highland Lake*, 880 F.2d 348 (11th Cir. 1989). As discussed in an earlier ruling by this Court on defendants' motion to dismiss, the Court of Appeals for the Third Circuit has adopted the "state-created danger" theory as a "viable mechanism for establishing a constitutional claim" under § 1983. See *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (1996). See also *Sciotto v. Marple Newtown Sch. Dist.*, No. 98–2768, 1999 WL 79136, at *5 (E.D.Pa. Feb. 9, 1999).[5] The Court of Appeals for the Third Circuit has not overturned its holding in *Kneipp* and the Supreme Court has not ruled on "state-created danger" since this Court ruled on the motion to dismiss, and thus there is no need to revisit the viability of the "state-created danger" theory here.[6]

---

**3.** While each school district defendant does not raise each issue, the arguments apply with equal force to each school district defendant and will be considered the Court as they apply to all three school district defendants.

**4.** As discussed in this Court's ruling on defendants' motion to dismiss, plaintiffs are proceeding under the "state-created danger" theory, one of two exceptions to the general rule that "a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). A second exception is the "special relationship" theory, under which a duty to protect may arise out of " 'special relationships' created or assumed by the State with respect to particular individuals," (i.e., custody). *Id.* at 197, 109 S.Ct. 998. It is clear that plaintiffs are not proceeding under this latter theory, and therefore

defendants' assertions that Louis Sciotto was not in the custody of the state and that plaintiffs have not satisfied the elements of a special relationship theory are superfluous.

**5.** This Court also found that the appropriate standard to apply in "state-created danger" cases is "deliberate indifference," which is a lesser standard than a "shock the conscience" test. See *Leffall v. Dallas Ind. Sch. Dist.*, 28 F.3d 521 (5th Cir.1994).

**6.** The school district contends that the Supreme Court's decisions in *Collins v. Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) and *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) render the viability of the "state-created danger" theory uncertain. However, the Court of Appeals for the Third Circuit found the "state-created danger" theory to be viable five years after *Collins* was decided, and the school district points to no

I will first analyze the plaintiffs' evidence in support of its claim that the state actors' (in this case, Nathans and Smith) conduct in this case meets the elements of the "state-created danger" test set forth in *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir.), *cert. denied*, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995).

## 2. Individual Liability

█ The school defendants contend there is no genuine issue of material fact as to whether the conduct of Nathans and Smith satisfies the four prongs of the "state-created danger" theory test set forth in *Mark*. 51 F.3d at 1152. Based on the evidence now before the Court, I conclude that a reasonable jury could find that the elements of a constitutional claim under the "state-created danger" theory are met.

The first element of the "state-created danger" theory requires that "the harm caused was foreseeable and fairly direct." *See Mark*, 51 F.3d at 1152. Plaintiffs assert that the invitation of older, heavier, more experienced alumni wrestlers to wrestling practice at Marple Newtown High School and allowing them to "live wrestle" team members created a foreseeable, fairly directly risk of harm to wrestlers like Louis Sciotto. The school defendants argue that because Louis Sciotto maintained complete freedom over his actions, the harm he suffered was not foreseeable, and that the causal link between the tradition of inviting alumni wrestlers to practice and the injury to Louis Sciotto is too attenuated.

Plaintiffs have produced evidence supporting the foreseeability of the injury to Louis Sciotto. Most directly on point, plaintiffs produced the statement of a wrestling expert, Andrew M. Matter, who concludes that inviting older, heavier, more experienced alumni wrestlers to practice and allowing them to "live wrestle" younger, lighter, less experienced high school wrestlers was "an accident waiting to happen." (Plaintiffs' Response to Defendant James Smith's Motion for Summary Judgment (filed May 21, 1999) (hereinafter Plaintiff's Response to Smith), Exhibit H, Statement of Andrew B. Matter).

It is not disputed that Nathans and Smith were aware of the existence and promotion of longstanding tradition of inviting older, heavier, more experienced alumni to participate in wrestling practices. (Smith's Exhibit G, Nathans Deposition, at 50; Exhibit F, Smith Deposition, at 16). Smith had personally observed alumni wrestlers participating in practice on approximately six occasions prior to the injury to Louis Sciotto, and knew that lighter wrestlers were allowed to "live wrestle" with heavier wrestlers. (Smith's Exhibit F, Smith Deposition, at 16–17). Nathans openly promoted the tradition each year at the wrestling banquet, (Smith's Exhibit G, Nathans Deposition, at 50), and he personally invited Fendler to attend wrestling practice pursuant to that tradition. (Smith's Exhibit D, Fendler Deposition, at 39). In addition, Nathans was aware of a prior injury suffered by a Marple Newtown High School team member while "live wrestling" with an alumnus. (Smith's Exhibit G, Nathans Deposition, at 57–58). Furthermore, there is evidence of a subsequent injury under similar circumstances, underscoring the danger of allowing alumni to wrestle high school wrestlers. (Smith's Exhibit H, J. Leon Deposition, at 63–64).

In addition, plaintiffs cite the By–Laws of the Pennsylvania Interscholastic Athletic Association (PIAA) governing high school athletics and interpretations thereof which forbid alumni and college athletes

explicit language in *County of Sacramento* nor any case subsequently decided by any court in which the Supreme Court's holding in *County of Sacramento* is found to decimate the "state-created danger" theory. The "state-created danger" theory is nowhere mentioned or discussed in *County of Sacramento,* and the factual context is quite different from this case. In sum, I conclude that the "state-created danger" theory remains alive and well in the wake of *Collins* and *County of Sacramento.*

from participating in contests with or scrimmaging with high school athletes, specifically in wrestling. *See* Plaintiffs' Response to Smith, at 4–7. Also supporting foreseeability are parental complaints concerning the safety of the tradition of inviting alumni to practice, of which Smith was informed. (Plaintiffs' Exhibit B, Price Deposition, at 29). Plaintiffs also point to the Wrestling Rules Book of the National Federation of State High School Associations to demonstrate the dangers of wrestling outside one's weight class. *See* Plaintiffs' Response to Smith, at 4–7.

I conclude that a reasonable jury could find—on the basis of expert observations on the dangerousness of the tradition of inviting alumni to wrestling practices, a prior injury under similar circumstances, parental complaints about the safety of the practice, and relevant rules governing high school athletics—that inviting older, heavier, more experienced alumni wrestlers to practice with the Marple Newtown High School wrestling squad and thus allowing Fendler to "live wrestle" with younger, lighter, less experienced members of the high school team, including Louis Sciotto, created a foreseeable risk of injury, and that a reasonable wrestling coach and athletic director knowing of such a practice, could have foreseen an injury to such a wrestler as Louis Sciotto.[7] Furthermore, a reasonable trier of fact could find that Nathans' invitation to Fendler and supervision of the live wrestling period, and Smith's condonation of the participation of alumni wrestlers "fairly directly" caused the injury to Louis Sciotto[8], because but for the invitation and the accepted tradition of allowing live wrestling between alumni and high school wrestlers, Fendler would not have been at practice and would not have wrestled Louis Sciotto. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir.1997).[9]

The second of the "state-created danger" elements is that the state actor acted with willful disregard for the plaintiffs' safety. *See Kneipp*, 95 F.3d at 1208. "[T]he environment created by the state actors must be dangerous; they must know it to be dangerous; and ... must have been at least deliberately indifferent." *Johnson*, 38 F.3d at 201. The plaintiffs have produced evidence of Nathans' and Smith's knowledge of and participation in the tradition of inviting older, heavier,

7. The evidence of foreseeability here is at least as substantial as in *Kneipp*. There, police officers stopped an inebriated woman and her husband on a cold night, allowed the husband to continue on, and then left the woman to walk home by herself. The woman was later found unconscious, suffering from hypothermia and anoxia, and sustained brain damage as a result. *See Kneipp*, 95 F.3d at 1201–03. The court there found that a jury could conclude that she was "more likely to fall and injure herself if left unescorted than someone who was not inebriated." *Id.* at 1208. In the present case, particularly in light of a prior injury to a Marple Newtown student during live wrestling with an alumnus, when compared to the facts in *Kneipp*, it could be found by a reasonable trier of fact that an injury to Louis Sciotto, a high school wrestler grappling with an older, heavier, more experienced alumnus, was foreseeable.

8. Causation in the "state-created danger" setting will often be less than direct, as the factual setting necessarily includes an independent "danger"—in some cases a third party, in others a cold night or a state of inebriation, as in *Kneipp*—that leads to an injury to the plaintiff. *See Kneipp*, 95 F.3d at 1203. By analogy, the proper inquiry on causation under the state-created danger theory is not whether the state actor "pulled the trigger," but whether the state actor placed the plaintiff in a bullet's likely path.

9. In *Morse*, the Court of Appeals for the Third Circuit suggested that a defendant's actions must have "precipitated" or been a "catalyst" for the defendant's injury at the hands of a third party. 132 F.3d at 910. Nathans' invitation to Fendler and supervision of the live wrestling period, and Smith's and the school district's maintenance of the policy of inviting alumni wrestlers to practice were certainly catalysts for the injury to Louis Sciotto—but for the invitation and the policy, Fendler would not have been at practice and would not have wrestled Louis Sciotto. Thus, there is sufficient evidence to raise a genuine issue of material fact as to whether the defendants fairly directly caused the harm.

more experienced alumni wrestlers to practice (Smith's Exhibit G, Nathans Deposition, at 50; Exhibit F, Smith Deposition, at 16), a prior injury to another student under similar circumstances (Smith's Exhibit G, Nathans Deposition, at 57), and an expert's report that a reasonably knowledgeable wrestling official would recognize the danger of the encounter between Fendler and Louis Sciotto. (Plaintiffs' Exhibit H, Statement of Andrew B. Matter). I conclude that a reasonable trier of fact could find on the basis of this evidence that inviting older, heavier, more experienced alumni wrestlers and allowing them to "live wrestle" with high school wrestlers created a "dangerous environment," and that Smith and Nathans knew of the danger and were nevertheless deliberately indifferent to it. *See Johnson*, 38 F.3d at 201.[10]

The third element plaintiff must show is that "there existed some relationship between the state and the plaintiff." *Kneipp*, 95 F.3d at 1208. A relationship sufficient to satisfy this element can be found in cases where the state acts to make "a discrete plaintiff vulnerable to a foreseeable injury," *Mark*, 51 F.3d at 1153, or the plaintiff belongs to an identifiable and discrete class of persons subject to the harm. *See Morse*, 132 F.3d at 913–14. Plaintiffs have presented evidence that Louis Sciotto, as a member of the high school wrestling team at Marple Newtown High School, was a member of a class made vulnerable to a wrestling injury by the policy maintained and condoned by Nathans and Smith. The statement of plaintiffs' wrestling expert supports this contention (Plaintiffs' Exhibit H, Statement of Andrew B. Matter), as do the limitations on alumni participation in wrestling and wrestling outside one's

weight class contained in the by-laws of the PIAA and the Wrestling Rule Book. *See* Plaintiffs' Response to Smith, at 4–7. I conclude that a reasonable jury could find from this evidence that Louis Sciotto was a discrete, foreseeable victim of the custom maintained and condoned by both Nathans and Smith.

The fourth prong is satisfied when "the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur." *Mark*, 51 F.3d at 1152. The relevant conduct by the state actor may be either an affirmative act or an omission. *See Morse*, 132 F.3d at 915.

Plaintiffs allege that by creating, maintaining, and condoning a custom of inviting older, heavier, more experienced alumni wrestlers to practice, and by inviting Fendler to practice and allowing him to wrestle team members, the school defendants created an opportunity for Fendler to harm Louis Sciotto. The evidence shows that Nathans used his authority to invite numerous alumni to participate in practice, and that he extended a personal invitation to Fendler to participate in practice. (Smith's Exh. G, Nathans Deposition, at 50; Exh. D, Fendler Deposition, at 41–42). Smith was well aware of this practice, having attended wrestling banquets at which graduating seniors were invited to return to wrestling practice after graduation and having personally observed wrestling practices at which he knew alumni wrestlers were present. (Smith's Exhibit F, Smith Deposition, at 17, 28). Smith allowed this tradition to continue, despite the fact that he was told by the superintendent, John Wingerter, to cease allowing alumni to practice with the wrestling squad for safety reasons. (Plaintiffs' Ex-

---

10. Deliberate indifference is established by showing "(1) an unusually serious risk of harm ... (2) defendant's actual knowledge of (or at least willful blindness to) that elevated risk, and (3) defendant's failure to take steps to address that known, serious risk." *Manarite v. City of Springfield*, 957 F.2d 953, 956

(1st Cir.1992). Plaintiffs have produced evidence that the tradition of inviting alumni wrestlers involved a serious risk of harm, that Nathans and Smith were aware of the risk (through a prior injury and parental complaints), and that they failed to stop the tradition.

hibit B, Patricia Price Deposition, at 50, 52).

A reasonable jury could conclude that Smith and Nathans, by maintaining a tradition of inviting older, heavier, more experienced alumni to participate in wrestling practices, "used their authority to create an opportunity" for Fendler to injury Louis Sciotto that would not have otherwise existed. But for the tradition and Nathans' invitation to Fendler pursuant to that tradition, Fendler would not have been present at practice, and would not have live wrestled Louis Sciotto on January 10, 1997. On the basis of this evidence, I conclude that a genuine issue of material fact exists as to whether the school defendants used their authority to create an opportunity for the events to occur which caused the injury suffered by Louis Sciotto.

■ In light of the foregoing analysis, I conclude that plaintiffs have produced sufficient evidence on the basis of which a reasonable trier of fact could find that the conduct of Nathans and Smith satisfies the elements of the "state-created danger" theory, caused the injury complained of, and thereby violated his constitutional right to bodily integrity under Fourteenth Amendment.[11]

### 3. Qualified Immunity

Defendants James Smith and Stu Nathans claim that they are entitled to qualified immunity from plaintiffs' suit. The defendants have met their burden of pleading a qualified immunity defense, *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), and it is for this Court to determine at the summary judgment stage whether qualified immunity is appropriate. *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1792, 114 L.Ed.2d 277 (1991).

■ The defense of "qualified immunity" for public officials finds its roots in the Supreme Court's decisions in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In *Harlow*, the Court stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory of constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. 2727 (citations omitted). *See also Anderson*, 483 U.S. at 639, 107 S.Ct. 3034 (the question of qualified immunity "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.") (citations omitted).

More recently, in *Siegert v. Gilley*, the Supreme Court clarified the analysis in

11. Defendants contend that the free and voluntary nature of Louis Sciotto's participation in the wrestling program and his choice to wrestle Greg Fendler exonerates them from liability under the "state-created danger" theory. While freedom and voluntary participation may be persuasive under a "special relationship" theory, I find no cases holding that voluntary actions by the plaintiff nullify a "state-created danger" claim. If voluntary actions by the plaintiff contributing to his or her own danger were dispositive, the Court of Appeals for the Third Circuit would have concluded that the plaintiff's voluntarily decision in *Kneipp* to become severely inebriated, and attempt to walk home, which undoubtedly contributed to her eventual fall and consequent injuries, prevented her from asserting a valid "state-created danger" claim. The Court of Appeals for the Third Circuit did not do so there, and I decline to do so today.

Defendants cite *Fenstermaker v. Nesfedder*, 802 F.Supp. 1258 (E.D.Pa.1992) in support of their "free and voluntary choice" argument. In that case, the district court held that plaintiff, a high school wrestler, could not assert a substantive due process violation by his wrestling coach where plaintiff chose to continue to wrestle after being injured in a match and the coach allowed him to do so, and plaintiff suffered severe injuries to his knee. While admittedly the facts bear some similarity to those of this case, the decision is not binding and the court there did not address the "state-created danger" theory. Thus, the court's holding in *Fenstermaker* is distinguishable.

the qualified immunity setting, requiring that the district court first determine "whether the plaintiff has asserted a violation of a constitutional right at all." 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). *See also Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right). The district court must then proceed to assess whether the right was "clearly established" at the time of the alleged violation, and whether the unconstitutional nature of the action would have been apparent to an objectively reasonable official. *See Showers v. Spangler,* 182 F.3d 165, 171–72 (3d Cir.1999).

### a. Constitutional Right

In *Anderson,* the Supreme Court observed that the outcome of the second prong of the qualified immunity inquiry (whether a right is clearly established) "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." 483 U.S. at 639, 107 S.Ct. 3034. The Court cautioned against defining the relevant right at too high a level of abstraction and required the right to be defined "in a more particularized, and hence more relevant sense." *Id.* at 640, 107 S.Ct. 3034.

The plaintiffs have asserted a violation of Louis Sciotto's constitutional right to bodily integrity under the Fourteenth Amendment, which has been recognized by the Supreme Court. However, in light of the Court's admonition in *Anderson,* the "right to bodily integrity" is too abstract an identification for the purposes of assessing qualified immunity. A more particularized identification of the right is warranted.

I conclude that the relevant constitutional right for purposes of qualified immunity in this case is a student's right to freedom from school officials' deliberate indifference to, or affirmative acts that increase the danger of, serious injury from unjustified invasions of bodily integrity perpetrated by third parties in the school setting. The level of particularity with which the relevant right is identified here is consistent with the identifications of constitutional rights by this and other circuits in qualified immunity cases. *See Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir.1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (identifying the "right to freedom from invasion of … personal security through sexual abuse" in a school setting); *LaBounty v. Coughlin,* 137 F.3d 68, 73, 74 (2d Cir.1998) (disagreeing with the district court's formulation of the right as "the right to be free from crumbling asbestos" and redefining the right as the "right to be free from deliberate indifference to serious medical needs"); *Lewis v. Cowen,* 165 F.3d 154, 167 (2d Cir.1999) (finding overbroad the district court's definition of the right as "the freedom of speech" and redefining the inquiry as "whether the defendants should have known that terminating a policymaking public employee for refusing to promote agency policy as directed by his employer would violate the First Amendment"); *Kelley v. Borg,* 60 F.3d 664, 667 (9th Cir.1995) (finding the district court had appropriately defined the right as the right in the prison context to be free from deliberate indifference to serious medical needs); *Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 1999 WL 569138 (10th Cir., August 4, 1999) (defining the right as a right to freedom from state actor's conscious acquiescence to sexual harassment in school setting).

### b. Clearly Established

"Clearly established" law has proven itself a rather elusive quarry for courts at every level.[12] The struggles of the Su-

---

12. For enlightening discussions on the subject of "clearly established" law in the § 1983 setting, see Martin A Schwartz and John E. Kirklin, *Section 1983 Litigation Claims and* *Defenses,* 3d ed., § 9.23, at 385–400 (1997) and Karen Blum, "Qualified Immunity: A User's Manual," 26 *Indiana L.Rev.* 187, 199–204 (1993).

preme Court and the circuits to bring coherence to their analysis in this area led one jurist to remark, "[T]he meaning of 'clearly established' is not yet clearly established." *Savidge v. Fincannon,* 836 F.2d 898, 910 (5th cir.1988) (Gee, J., concurring in part and dissenting in part). Nevertheless, some guiding lights can be seen penetrating the fog that shrouds this aspect of the qualified immunity analysis.

The Supreme Court offers the following guidance to courts seeking to identify clearly established rights:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law, the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

More recently, the Court stated in a discussion of what constitutes "clearly established law" in the criminal context that

> general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in the question has [not] previously been held unlawful.

*United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citations and internal quotations omitted).

The Court of Appeals for the Third Circuit elaborated on what constitutes a clearly established right in *Stoneking,* stating, "this court does not require relatively strict factual identity between applicable precedent and the case at issue.... '[S]ome, but not precise factual correspondence' to precedent would be required." *Stoneking,* 882 F.2d at 726 (quoting *People of Three Mile Island v. Nuclear Regulatory Comm.,* 747 F.2d 139, 144 (3d Cir. 1984)). The *Stoneking* court added:

> We expect officials to apply general, well developed legal principles. We have explained that we have adopted a broad view of what constitutes an established right of which a reasonable person would have known, which requires us to undertake an inquiry into the general legal principles governing analogous factual situations, if any, and a subsequent determination whether the official should have related this established law to the instant situation.

*Stoneking,* 882 F.2d at 726 (internal quotations and citations omitted).[13]

The Court of Appeals for the Third Circuit has looked to the decisions of the Supreme Court and sister circuits to find clearly established rights, *Prisco v. United States Department of Justice,* 851 F.2d 93 (3d Cir.1988), *cert. denied,* 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 985 (1989), though it has held that a "lone district court case from another jurisdiction" cannot suffice to establish a right for qualified immunity purposes. *See Brown v. Grabowski,* 922 F.2d 1097, 1118 (3d Cir.1990), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991). *See also Hayes v. Long,* 72 F.3d 70, 73–74 (8th Cir.1995) ("In the absence of all binding precedent, a court should look to all available decisional law including decisions of state courts, other circuits and district courts ..." in determining whether a right is clearly established.)

---

**13.** *See also Coady v. Steil,* 187 F.3d 727, 734 (7th Cir.1999) ("[I]f plaintiffs had to point to a case on all fours with their own, defendants would nearly always be entitled to qualified immunity. However, we have rejected that argument."); *Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1251 (10th Cir. 1999) ("We have never said that there must be a case present the exact fact situation at hand in order to give parties notice of what constitutes actionable conduct. Rather, we require parties to make reasonable applications of the prevailing law to their own circumstances.").

■ In summary, in order to determine whether the right at issue in this case—a student's right, in a school setting, to freedom from school officials' deliberate indifference to, or acts that increase the risk of serious injury from unjustified invasions of bodily integrity perpetrated by third parties—is clearly established, this Court must ascertain whether the right at issue was broadly identified or generally apparent in the decisions of this and other circuits and the Supreme Court made prior to Louis Sciotto's injury on January 10, 1997.

■ After thoroughly reviewing the relevant case law, I conclude that it was clearly established at the time of the injury that a student enjoyed a constitutional right to be free from school officials' deliberate indifference to, or acts that increase the risk of serious injury from unjustified invasions of bodily integrity perpetrated by third parties.

In the school setting, the Supreme Court long ago ruled that the Due Process Clause protects "a right to be free from unjustified intrusions on personal security" in the form of corporal punishment by teachers. *See Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1403, 51 L.Ed.2d 711 (1977). More than a decade ago the Court of Appeals for the Third Circuit recognized a student's right to be free from sexual molestation by a teacher under the Fourteenth Amendment. *See Stoneking*, 882 F.2d at 727.

The decisions of the Court of Appeals for the Third Circuit have illuminated the circumstances under which school officials may be held liable for the acts of third parties in the school setting. In *Stoneking*, the court held that it was clearly established in 1981 that a supervisory

school official's deliberate indifference to sexual assaults upon public school children by subordinates will subject the supervisor to liability for a due process violation. *See Stoneking*, 882 F.2d at 730. Deliberate indifference, the court held, could take the form of "affirmative acts, condonation, or encouragement." *Id.* In *D.R. v. Middle Bucks Area Voc. Tech Sch.*, 972 F.2d 1364, 1374 (3d Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993), the court, calling it "an extremely close case," held that school officials could not be held liable under a "state-created danger" theory for sexual assaults on students by other students that took place in rooms that were part of a larger classroom suggesting that the school officials did not act affirmatively to create the danger or increase the risk of harm to the victim. The court thus made it clear that affirmative acts that increased the risk of harm to students by other students could form the basis of a constitutional violation.[14]

Similarly, in the subsequent district court decision in *Hunter v. Carbondale Area Sch. Dist.*, 829 F.Supp. 714 (M.D.Pa.) *aff'd*, 5 F.3d 1489 (1993), *cert. denied*, 510 U.S. 1081, 114 S.Ct. 903, 127 L.Ed.2d 94 (1994), the court held that the "state-created danger" theory did not apply to the death of a special education student who was placed in detention with other nonspecial education students and was subsequently chased off school property into a stream where he drowned. However, the court, as in *D.R.*, clearly identified by inference a set of circumstances under which school officials would be held liable for the acts of third parties: "[T]here is nothing on the record that suggests that either Defendants encouraged, facilitated, or authorized the students to engage in the conduct which took place." *Id.* at 721.

---

14. The Court of Appeals for the Third Circuit has concluded that while an affirmative act is compelling evidence of a state-created danger, a plaintiff need not establish an affirmative act by the defendant in order to state a claim under the "state-created danger" theory. *See Morse*, 132 F.3d. at 915 ("[T]he dis-

positive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission.").

Thus, it was clear after *Hunter* that a constitutional claim under § 1983 would be established in circumstances where school officials encouraged, facilitated, or authorized the conduct that led to the injury.

The decisions of other circuit courts of appeals prior to Louis Sciotto's injury also fleshed out the contours of school officials' liability for injuries inflicted by third parties. In *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir.1994), *cert. denied*, 514 U.S. 1017, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995), the court found that school officials were not liable for the death of a student hit by a stray bullet fired by a non-student in a school hallway. The court suggested the circumstances under it would find a violation of a student's constitutional rights under a "state-created danger" theory: where there was awareness of and deliberate indifference to a danger among school officials, where there was affirmative conduct by school officials, or where a state actor placed a student in a "unique, confrontational encounter" with a violent individual. *See id.* at 202. Likewise, in *Leffall v. Dallas Ind. Sch. Dist.*, 28 F.3d 521, 531 (5th Cir.1994), the court suggested that where "the state knowingly brought the victim into close proximity with a specific individual known to be likely to commit violence," the "state-created danger" theory would apply. In *Graham v. Ind. Sch. Dist. No. I–89*, 22 F.3d 991, 995 (10th Cir.1994), the Tenth Circuit suggested evidence of affirmative actions by school officials will establish a "state-created danger" claim.

Furthermore, as discussed above, the Court of Appeals for the Third Circuit has applied the "state-created danger" theory numerous times, and in 1996 confirmed that state officials may be liable under the "state-created danger" theory. *Mark*, 51 F.3d 1137.

Thus, since *Ingraham* was decided two decades ago, it has been clearly established that a student's right to bodily integrity must be respected in the school setting. *Stoneking* stated that a substan-

tive due process violation will be found where a school official affirmatively acts, or encourages or condones (i.e., is deliberately indifferent to), behavior by subordinates that leads to an invasion of bodily integrity. Furthermore, since *D.R.*, *Hunter*, and *Kneipp*, it has been clear in this circuit that school officials may be held liable for a constitutional violation where they affirmatively act to place a student in danger of harm by a third party non-state actor. *Johnson, Leffall,* and *Graham* in other circuits lent additional clarity.

Individually and taken as a whole, these cases clearly were sufficient to "give fair warning" to school officials that when they affirmatively acted to place a student in danger of physical harm at the hands of third parties, or were deliberately indifferent to such danger, a constitutional violation would be found. *See United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). While it would appear that no case prior to Louis Sciotto's injury had held school officials constitutionally liable for student injuries perpetrated by third parties, the cases cited above clearly set forth the circumstances under which liability would be found.

Defendants appear to argue that because no constitutional right has been found under identical facts, it is impossible to find that the right asserted by Louis Sciotto was clearly established. However, neither the Court of Appeals for the Third Circuit nor the Supreme Court requires "strict factual identity" to the present case, and this Court need only find "some factual correspondence" to identify a clearly established right. *See Stoneking*, 882 F.2d at 726. The facts in *D.R.* and *Hunter* offer factual correspondence—violence against students by third parties under the supervision of school officials—and though the courts in those cases did not find violation of a constitutional right, they made clear the circumstances under which a violation would be found. I conclude that the facts in this case—in particular, the affirmative acts and conscious decisions by

school officials to permit and encourage the wrestling practices involved here—fall within the circumstances envisioned by those cases to constitute a civil rights violation.

Based on the "the general legal principles governing analogous factual situations," *id.*, and the "general statements ... in other decisional law," *Lanier*, 520 U.S. at 271, 117 S.Ct. 1219, I conclude that the "contours" of the constitutional right to freedom from school officials' deliberate indifference to, or acts that increase the risk of serious injury from unjustified invasions of bodily integrity perpetrated by third parties were clearly established at the time of the injury to Louis Sciotto.

### c. Objectively Reasonable

Though the right at issue was clearly established, it remains to be determined whether a reasonable official in the position of Stu Nathans or James Smith would have known that his or her actions were unconstitutional. Normally, where the constitutional right at issue is found to be clearly established, "the immunity defense should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–819, 102 S.Ct. 2727.

■ The "objectively reasonable" inquiry asks "whether a reasonable person could have believed the defendant's actions to be lawful in light of clearly established law and the information he possessed." *Anderson*, 483 U.S. at 641, 107 S.Ct. 3034. The Court of Appeals for the Third Circuit has stated that "a good faith belief in the legality of the conduct is not sufficient." *Parkhurst v. Trapp*, 77 F.3d 707, 712 (3d Cir.1996). Rather, the belief must be objectively reasonable. The Court of Appeals for the Third Circuit has required an "individualized analysis" of the objective reasonableness of each official. *See Rouse v. Plantier*, 182 F.3d 192, 200 (3d Cir. 1999).

A defendant may defeat a finding that her conduct was not objectively reasonable in two ways. First, under "extraordinary circumstances," a defendant may argue that she "neither knew nor should have known of the relevant legal standard." *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727. Second, defendant also may argue that the information she possessed was sufficient for a reasonable person to conclude her actions were lawful. *See Singer v. Maine*, 49 F.3d 837, 844 (1st Cir.1995) (citations omitted).

At the time of the injury to Louis Sciotto, Stu Nathans, had been a wrestling coach and teacher of health and physical education at Marple Newtown High School for more than 25 years. I conclude that a reasonable official in his circumstances—as both a teacher and the school official in charge of the wrestling program—would have understood the contours of a student's clearly established right not to be placed in danger of harm by a third party, or not to be abandoned to that harm by deliberately indifferent school officials. Nathans has presented no "extraordinary circumstances" that would justify his lack of awareness in this regard. The plaintiffs also have produced evidence that Nathans possessed sufficient information on the basis of which a reasonable person could conclude that inviting older, heavier, more experienced wrestlers to a high school wrestling practice and allowing them to "live wrestle" with team members posed a danger to students and could constitute a constitutional violation. This information included knowledge of a prior injury under circumstances similar to the present case, wrestling guidelines forbidding matches with alumni and limiting matches outside of one's weight class and matches, and parental complaints and admonitions. Nathans has produced no evidence to suggest that the information he possessed at the time of the injury was sufficient for a reasonable person to conclude his actions were lawful. *See Singer*, 49 F.3d at 844.[15]

15. Whether or not this danger was foresee-　able enough to hold Nathans liable for the

In 1997, James Smith had been a football coach at Marple Newtown for 11 years and the athletic director for eight years. Prior to that, he was a teacher and coach for 30 years in another school district. I conclude that a reasonable official in his circumstances would have been aware of a student's right not to be placed in a situation where another person would cause physical injury to her. Smith has not suggested that extraordinary circumstances should excuse his unawareness of this right. Plaintiffs have produced evidence that Smith was aware of the danger of the tradition of inviting alumni wrestlers to practice at Marple Newtown, including the communication to Smith of parental concerns and admonitions from the board of school directors regarding the safety of the custom.

█ Based on the evidence viewed in a light most favorable to the plaintiffs, I conclude that a reasonable school official, on the basis of the information known to Nathans and Smith, would have believed that the constitutional right at issue here—a student's right to be free from school officials' deliberate indifference to, or affirmative acts that increase the danger of serious injury from unjustified invasions of bodily integrity perpetrated by third parties—was threatened by the custom of inviting and allowing older, heavier, more experienced alumni wrestlers to live wrestle the students at practice.

I also conclude that issue of whether defendants had enough knowledge to establish the foreseeability of the injury and whether their acts or omissions were sufficient to show causation are, based upon the record before this Court, separate factual inquiries that are appropriately reserved for the jury.

### 4. School District Liability

#### a. State Created Danger

█ Plaintiffs also assert their "state-created danger" theory claim against the

school district. The conduct of Nathans and Smith, however, does not alone confer liability on the school district, for while a municipality may be held liable for constitutional deprivations under § 1983, it is well settled that a municipality may not be held liable under § 1983 on a theory of *respondeat superior*. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). It remains to be determined here whether or not the school district may be held liable for their violation of Louis Sciotto's constitutional rights under the state-created danger theory.

The Court of Appeals for the Third Circuit has not directly addressed the issue of a municipality's liability under a state-created danger theory. Most often, municipalities and individual state actors have been lumped together under the analysis, *see D.R.*, 972 F.2d at 1376 (addressing the liability of "school defendants," which included the school, the school district, teachers, and officials), or as in *Kneipp*, the state-created danger analysis is only applied to individual state actors. The question is this: beyond the elements of the state-created danger theory, what additional analysis must a court perform to determine whether a municipality is liable under state-created danger?

It is clear that a municipality may be liable under § 1983 on a state-created danger theory. *See Cornelius v. Highland Lake*, 880 F.2d 348 (11th Cir.1989), *reh'g denied*, 887 F.2d 1093, *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). However, in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality will not be held liable for the unconstitutional acts of a state actor unless the conduct that caused the harm was pursuant to a government policy, custom, or practice. The Court of Appeals for the Third Circuit has recog-

injury to Louis Sciotto, as I have previously

held, is a matter for the jury to decide.

nized this inquiry into municipal liability—the "policy, custom, or practice" inquiry—as a separate and distinct analysis of liability from the state-created danger theory. *See Kneipp*, 95 F.3d at 1211. *See also Maxwell v. Sch. Dist., City of Philadelphia*, 53 F.Supp.2d 787, 793 (E.D.Pa.1999); *Hunter*, 829 F.Supp. at 721.

Thus, in analyzing a constitutional claim against a municipality, under the state-created danger theory, a court must choose among three different paths: (1) determining only whether the elements of a state-created danger theory are met and conducting no further analysis; (2) conducting a full "policy, practice or custom" theory analysis on top of the state-created danger inquiry; or (3) finding a middle ground.

The first option is inappropriate, because it does not require any showing of the municipality's knowledge of the unconstitutional conduct, and therefore could result in *respondeat superior* liability. The second option is equally inappropriate. Under the *Monell* policy, practice, or custom theory, the underlying violative act must have been committed by a state actor. To require such a showing to establish municipal liability under a state-created danger theory would be to eviscerate the state-created danger theory, because the theory is premised upon the notion that, under certain circumstances, a state can be held liable for harm inflicted by private actors. *See Kneipp*, 95 F.3d at 1204–1205 (discussing roots of the special relationship and state-created danger theories in the Supreme Court's holding in *DeShaney*).

The Seventh Circuit found a middle ground in holding that the proper analysis of municipal liability inquiry in a "state-created danger" setting requires a court to determine whether the municipality "ratified" the unconstitutional conduct of its employees. *See Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir.1998), *petition for cert. filed*, 67 U.S.L.W. 3684 (April 28, 1999) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). The plaintiff may show that the municipality ratified the conduct in two ways: (1) when the decision by a subordinate was "cast in the form of a policy statement and expressly approved by the supervising policymaker;" or (2) when "a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915. *See also Monfils*, 165 F.3d at 517. In the latter case, the policymaker or supervisor's "awareness" must have been more than a failure to investigate, but need not have risen to the level of formulating or initiating the policy. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915. I believe the "ratification analysis" is a correct approach to analyzing a municipality's liability under a state-created danger theory and adopt it for the purposes of this decision.[16]

Turning, then, to the facts of the case, plaintiffs allege that the tradition of inviting alumni wrestlers to practice with the Marple Newtown High School wrestling team constitutes a custom or practice that was ratified by the school district. A tradition can be "so common and well settled as to constitute a custom that fairly

---

**16.** The ratification analysis of municipal liability under the state-created danger theory is different than the "policy, practice, or custom" theory of liability under § 1983 in that it requires only the establishment of a custom or policy and an awareness of that custom or policy among policymakers. It does not require proof of proximate cause or deliberate indifference or a commission of the underlying violative act by a state actor, which are elements of the analysis under the policy, practice or custom theory. *See Kneipp*, 95 F.3d at 1211–13. In requiring awareness, it avoids the problems of *respondeat superior* by requiring plaintiffs to show more than mere conduct by subordinates and preserves key elements of a *Monell* liability (proof of a policy or custom), while also allowing for the possibility of municipal liability where a private actor has committed the underlying harm.

represents municipal policy." *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.) (en banc), *reh'g denied,* 735 F.2d 861 (5th Cir.1984), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). In order to prove the existence of a custom, the plaintiff must show that policymakers with final decisionmaking authority knew of the policy and acquiesced in it. *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996). The school board and the superintendent qualify as relevant policy makers.[17]

Plaintiffs have produced evidence of the existence of a "longstanding tradition" of inviting older, heavier, more experienced wrestlers to wrestling practice at Marple Newtown High School. (Smith's Exhibit F, Smith Deposition, at 19–20; Exhibit G, Nathans Deposition, at 51–52). The school district does not deny the existence of the custom identified by the plaintiffs.[18] The practice had been in place for at least 30 years and was renewed every year at the wrestling banquet, where seniors were invited to return after graduation and participate in practices. (Smith's Exhibit G, Nathans Deposition, at 50).

The school board was made aware of the custom least two years prior to Louis Sciotto's injury through parental complaints, (Plaintiffs' Exhibit B, Price Deposition, at 29), and through the participation in the custom by then-president of the school board, Jorge Leon, who attended wrestling practices and live wrestled against members of the team, before for many years before Louis Sciotto's injury. (Smith's Exhibit H, J. Leon Deposition, at 14). In and around 1995, the school board twice discussed in executive session the custom of allowing alumni wrestlers to practice with the Marple Newtown high school squad. (Plaintiffs' Exhibit B, Price Deposition, at 24). At the first 1995 session, parental complaints were aired concerning the "safety" of the custom, and the board concluded that "it [the alumni participation in wrestling practice] was a safety factor and that John [Wingerter, Superintendent of Marple Newtown School District] was directed not to allow this to happen." (*Id.* at 31.). At a subsequent session, Wingerter told the board that "he spoke to Jim Smith or the proper people and that it was not continuing." (*Id.* at 52). Former board member Patricia Price talked to Wingerter "several" times about parents' safety concerns involving alumni wrestlers before Louis Sciotto's injury. (*Id.* at 58).

There is evidence, however, that the custom continued long after 1995, and that the school board was aware of it. Jorge Leon—a Marple Newtown alumnus who was on the school board from 1993–97 and was president of the school board when Louis Sciotto was injured—was likely involved in the 1995 discussions and the directive concerning alumni participation in wrestling practices. (Plaintiffs' Exhibit B, Price Deposition, at 23). Nevertheless, during the same time frame, up to and beyond the injury to Louis Sciotto, Leon participated in wrestling practices at Marple Newtown High School. (Smith's Exhibit H, J. Leon Deposition, at 13–15, 49–50).

---

**17.** Pennsylvania state law, under Public School Code, 24 P.S. § 5–511(a), places final policymaking authority for athletics in the hands of the school board.

"§ 5–511. School Athletics, publications, and organizations (a) The board of school directors in every school district shall prescribe, adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding, (1) the management, supervision, control, or prohibition of exercise, athletics, or games of any kind . . ."

Furthermore, as the chief executive officer of the school district, the superintendent can be considered a policymaker as well.

**18.** The school district argues that municipal liability cannot lie because the custom in this case is not unconstitutional. However, the Supreme Court has rejected the argument that the municipality's policy or custom itself must be unconstitutional. *See Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Additionally, there is evidence that then-superintendent of Marple Newtown School District John Wingerter, despite having received a directive from the school board put an end to alumni participation in wrestling practices for safety reasons in 1995, led a meeting of school officials in 1997, soon after Louis Sciotto's injury, during which the participants decided that the custom of allowing alumni to come to Marple Newtown High School wrestling practices "would remain as is." (Smith's Exhibit, Smith's Deposition, at 19–21).[19]

The plaintiffs need only bring forth evidence on the basis of which a reasonable jury could conclude that school district policymakers were "aware" of the custom and its danger. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915. Plaintiffs have demonstrated the school district's awareness of the tradition of inviting older, heavier, more experienced wrestlers to practice with Marple Newtown High School's wrestling team through parental complaints to board members and the participation of a board member in the tradition.[20] Parents' concerns about the safety of the practice establish the board's basic awareness of its danger. From the evidence before me, I conclude that Nathans' and Smith's conduct in allowing and inviting alumni wrestlers to participate in practices with the Marple Newtown High School wresting team could be found by a reasonable jury to be "a series of decisions by a subordinate official [that was] a custom or usage of which the supervisor [here, the school district] must have been aware," and that the liability of the school district can therefore be established under the "state-created danger" theory. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915.

### b. Practice, policy, or custom.

■ Plaintiffs also assert a claim against the school district under a different theory of § 1983 liability, claiming that the school district, by maintaining a "policy, practice, or custom" of allowing heavier, older, more experienced alumni to participate in practice, were deliberately indifferent to the risk of injury to Louis Sciotto and proximately caused his injury. *See Kneipp* 95 F.3d at 1207. The "policy, practice, or custom" theory is an alternative theory to the state-created danger theory, and hence involves a different analysis. *See, id.*

Under the policy, practice or custom theory, unlike the state-created danger theory, the underlying violative act must have been committed by a state actor pursuant to the policy, practice, or custom. The present case, however, lacks this "linchpin" of a policy, practice or custom claim, because the underlying violative act was committed by a non-state actor, Greg Fendler. *See D.R.*, 972 F.2d at 1376 (citing *Stoneking*, 882 F.2d 720). Plaintiffs have brought forward no evidence establishing that Fendler was anything but a private actor. Thus, their case against the school district cannot proceed under a policy, practice or custom theory.

## B. State Claims

### 1. Assault and Battery

■ In their amended complaint, plaintiffs assert a cause of action for assault and battery against Greg Fendler. *See* Amended Complaint, at ¶¶ 30–34 (filed April 29, 1999). Fendler moves for summary judgment on the sole grounds that no evidence has been produced suggesting that Fendler intended to harm Louis Sciotto. *See* Memorandum of Law Supporting

---

**19.** The Supreme Court has held that the formal pronouncement of opposition to a practice does not relieve a municipality from liability where the practice inconsistent with that pronouncement continues unabated. *See Praprotnik*, 485 U.S. at 130–31, 108 S.Ct. 915; *Id.* At 145 n.7 (Brennan, J., concurring)

**20.** The evidence before the Court also suggests that despite its 1995 directive, the school board and the superintendent was aware that alumni continued to participate in wrestling practices and acquiesced in their participation.

Defendant Greg Fendler's Motion for Summary Judgment, at 4–7 (filed April 29, 1999) (hereinafter Fendler's Memo). In support of his motion, Fendler offers his own deposition testimony and that of Louis Sciotto, recounting the circumstances of the injury.

In particular, Fendler argues that this Court may infer a lack of the requisite intent from (1) Louis Sciotto's voluntary choice to wrestle with Fendler; (2) the legality of the wrestling move Fendler executed; and (3) Fendler's lack of personal animus toward Sciotto. *See* Fendler's Memo, at 7. Plaintiffs respond that in light of Fendler's greater experience, age and weight, his conduct in wrestling with Sciotto was "wanton and reckless" and thus satisfies the intent prong of assault and battery. *See* Plaintiffs' Memorandum of Law in Opposition to the Motions for Summary Judgment of Defendants Marple Newtown School District, Stu Nathans and Greg Fendler, at 27 (filed May 21, 1999).

Assault is defined by the *Second Restatement of Torts* as an act "intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and ... the other is thereby put in such imminent apprehension." *See also Proudfoot v. Williams,* 803 F.Supp. 1048, 1054 (E.D.Pa.1992) (citing *Cucinotti v. Ortmann,* 399 Pa. 26, 159 A.2d 216 (1960)). Battery occurs when a person "acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and ... a harmful contact with the person of the other directly or indirectly results." *Restatement (Second) of Torts,* § 13 (1965).

Fendler's argument turns on the meaning of "intent" in the context of assault and battery. Intent exists when "the actor desires to cause the consequences of his act, or that he *believes the consequences*

*are substantially certain to result from it."* *Restatement (Second) of Torts,* § 8A (1965) [emphasis added].[21] Intent is not synonymous with desire or personal hostility—if it is shown that the defendant knew the likely consequences of his actions, personal hostility and desire are immaterial. *See Restatement (Second) of Torts,* § 13 cmt. c (1965).

While the plaintiffs have produced no evidence of either a desire on the part of Fendler to injure Louis Sciotto or some personal hostility Fendler bore toward Louis Sciotto, plaintiffs have produced sufficient evidence upon which a jury could find that Mr. Sciotto's injury was "substantially certain" to follow from Fendler's conduct. This evidence includes the undisputed age (6 years), weight (35 pounds), and experiential (NCAA Division I competition) advantage Fendler held over Louis Sciotto, and the report of wrestling expert Andrew M. Matter, which suggests that the wrestling move Fendler executed was potentially dangerous and would have been stopped by a referee in a match. (Plaintiffs' Response to Smith, Exhibit H, Statement of Andrew B. Matter).

Thus, I find that the plaintiffs have met their burden of showing that a genuine issue of material fact exists on the issue of intent and thus summary judgment will not be granted on the assault and battery claim under state law for the reason asserted by Fendler.

### 2. Negligence

■ Plaintiffs also assert a negligence claim against Fendler. Fendler responds that he falls within the definition of an "employee" under Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8501, et seq. ( "the Act"), and is thus entitled to immunity.

Section 8545 of the Act "grants to employees of local agencies the same immunity enjoyed by the agency for injuries re-

---

**21.** "If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treat-

ed by the law as if he had in fact desired to produce the result." *Restatement (Second) of Torts,* § 8A cmt. b (1965).

sulting from acts of the employee which are within the scope of the employee's office or duties." [22] *Brown v. Quaker Valley School District,* 86 Pa.Cmwlth. 496, 499, 486 A.2d 526, 528 (1984). Section 8501 of the Act defines an employee as:

> Any person who has acted on behalf of a government unit whether on a permanent or temporary basis, whether compensated or not and whether within or without the territorial boundaries of the government unit, including any volunteer fireman and any elected or appointed officer, member of a governing body or other person designated to act for the government unit. Independent contractors under contract to the government unit and their employees and agents and persons performing tasks over which the government unit has no legal right of control are not employees of the government unit.

Fendler is correct in asserting that the Act applies more broadly than the common understanding of "employee," and that formalities such as a contract, compensation, permanence, and title are not required to establish "employee" status. *See Murray v. Zarger,* 164 Pa.Cmwlth. 157, 164–65, 642 A.2d 575, 578 (1994); *Wilson v. Miladin,* 123 Pa.Cmwlth. 405, 409, 553 A.2d 535, 537 (1989). A person may qualify as an employee if he or she was "acting on behalf of" the government unit. *See Murray,* 642 A.2d at 578; *Wilson,* 553 A.2d 535.

In *Murray,* the court found that a volunteer assistant swimming coach at a high school, who was neither on school district payroll nor held a formal position, qualified as an employee under the Act and was therefore immune from a suit for negligence in a car accident while driving team members. In *Wilson,* the court held that a high school football player was an employee under the Act and entitled to immunity for from a suit stemming from contact with a spectator at a football game.

However, in both cases, the court relied on more than merely a finding of an act on behalf of the school district to find "employee" status.[23] Both cases carefully considered the factual context in which the individuals acted to determine whether they fit the Act's definition of an employee. In *Murray,* the court cited the assistant coach's "history of School District service" and the numerous occasions on which he drove team members in concluding that he was an employee of the school district. 642 A.2d at 578. In *Wilson,* the court cited the football player's membership on the football team, his wearing of the school uniform, and his compliance with the coach's instructions as indicative of "employee status." 553 A.2d at 537.[24] Thus, the determination of whether an individual falls within the Act's definition of "employee" is a highly fact-specific inquiry.

I cannot conclude in light of the evidence before the Court that the facts are so compelling in the defendant's favor as to warrant summary judgment on the matter of Fendler's employee status. I conclude that plaintiffs have produced sufficient evidence upon which a reasonable

---

**22.** Section 8541 provides: "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa.C.S.A. § 8541. If found to be an employee, Fendler would be immune under § 8541 and § 8545.

**23.** I do not read the holding in *Murray* and *Wilson* to be that any discrete act by any person on behalf of a government unit is sufficient to bestow "employee" status and its consequent immunity under § 8541. Such a holding would stretch even the statutes broad definition of "employee" beyond its bounds. The examples provided in the statute such as a volunteer fireman or elected official, coupled with the court's holding in *Murray,* at the very least imply that sustained or periodic service to the government unit is a requisite to a finding of employee status.

**24.** The court in *Wilson* also limited its finding of employee status to the facts of the case, stating, "under these limited circumstances ... Miladin was an 'employee' within the ambit of Section 8501." 553 A.2d at 537.

jury could find that Fendler was not an employee of the school district, including Fendler's own deposition testimony that his January 10, 1997, visit to wrestling practice was his first and only visit since graduation and that he had no history of service to the school district. (Smith's Exh. D, Fendler Deposition, at 38–39). Plaintiffs have thus met his burden under Rule 56, and I conclude that there is a genuine issue of material fact as to Fendler's immunity from suit under the Act.

## IV. CONCLUSION

Based on the foregoing review of the facts and taking the inferences most favorable to the plaintiff, I cannot conclude that the evidence is so one-sided that defendants must prevail as a matter of law. Accordingly, the motions of Marple Newtown School District, James Smith, Stu Nathans, and Greg Fendler for summary judgment will be denied.

An appropriate Order follows.