**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3535
_____

MICA D. SPADY, Individually and
as Administratrix of the Estate of Juanya Demore Spady,

v.

THE BETHLEHEM AREA SCHOOL DISTRICT; JOSEPH
J. RAY; HARRISON BAILEY, III; CARLTON RODGERS;
JOHN AND JANE DOE #1; SUSAN DALTON, RN;
KATHLEEN HALKINS, RN; JOHN AND JANE DOES 2-X

Carlton Rodgers,
                                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 5:12-cv-06731)
District Judge: Honorable Joel H. Slomsky
_____

Argued June 2, 2015
_____

Before: RENDELL, HARDIMAN, and VANASKIE,
*Circuit Judges*

(Opinion Filed: September 1, 2015)


Audrey J. Copeland, Esq. [*ARGUED*]
Marshall, Dennehey, Warner, Coleman & Goggin

620 Freedom Business Center, Suite 300
King of Prussia, PA 19406
         *Counsel for Appellant*

Steven C. Ameche, Esq. [*ARGUED*]
Richard J. Orloski, Esq.
The Orloski Law Firm
111 North Cedar Crest Boulevard
Allentown, PA 18104
         *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

VANASKIE, *Circuit Judge*.

This action stems from the death of Juanya Spady, the fifteen-year-old son of Appellee Mica Spady.[1] Juanya died of what appears to have been a rare form of asphyxiation known as "dry drowning" or "secondary drowning," shortly after his participation in a mandatory swimming class run by his physical education ("P.E.") teacher, Appellant Carlton Rodgers. Spady filed suit against Rodgers and the Bethlehem Area School District ("BASD"), claiming violations of her son's civil rights under 42 U.S.C. § 1983. Rodgers moved for summary judgment on the basis of qualified immunity, which the District Court denied. Because we agree with Rodgers's contention on appeal that his conduct did not violate a clearly established constitutional right, we will reverse the District Court's order denying summary judgment with instructions to grant summary judgment in Rodgers's favor.

_____

[1] For clarity, we will refer to Mica Spady as "Spady" and to her son as "Juanya."

2

I.

The facts of this case, as the District Court aptly noted, are "undeniably tragic."[2] *Spady v. Bethlehem Area Sch. Dist.*, No. CIV.A.12-6731, 2014 WL 3746535, at *1 (E.D. Pa. July 30, 2014). In November 2010, Juanya Spady transferred to Liberty High School, which is part of the BASD. A fifteen-year-old, tenth-grade student, Juanya was enrolled in a variety of classes, including a P.E. course taught by Rodgers, who had been a full-time P.E. teacher at Liberty for approximately four years and was a certified lifeguard.

As part of the P.E. curriculum, students rotated into a two-week swimming course conducted at Liberty's swimming pool. During the last week in November and the first week of December of 2010, Juanya's P.E. class was assigned to the swimming course. As per Rodgers's policy, students were required to be in the pool for the entirety of each class or risk having points deducted from their grade. This policy applied to non-swimmers as well as swimmers. Rodgers acknowledged that he was made aware that Juanya could not swim.

The classes were all taught in the same fashion, with Rodgers standing at the side of the pool and instructing the students for approximately 20 minutes on a specific stroke. After each lesson concluded, students were allowed to swim freely in the pool. In addition to Rodgers, a student lifeguard also was "on duty," although such supervision usually consisted of monitoring the pool from a reclined position on the bleachers. Non-swimming students could remain in the shallow end during the entirety of the class, but were also permitted to venture into the deep end by holding onto the side of the pool, a practice referred to as "gutter grabbing."

---

[2] As we are obligated to do in reviewing a motion for summary judgment, we recount the facts in the light most favorable to Spady, the non-moving party. *Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 179 n.1 (3d Cir. 2015).

Aside from these general procedures, there were no course policies governing instruction or swimmer safety.

On December 2, 2010, Juanya's first class of the day was P.E., which commenced at approximately 8:20 a.m. After roll was taken, Juanya entered the pool and swam in the shallow end for the first ten to fifteen minutes of class while Rodgers instructed the students from the side of the pool. At the conclusion of the lesson, Juanya departed the shallow end and began to "gutter grab" around the edge of the pool. While in the deep end, he ran into a group of students and was submerged for a matter of seconds, possibly inhaling or swallowing water as he resurfaced. Juanya then exited the pool and told Rodgers that his chest hurt. Rodgers responded by telling Juanya to sit on the bleachers for a few minutes.

Several minutes later, Rodgers went over to check on Juanya, who requested permission to remain out of the pool for the rest of class. Rodgers denied the request and told him to get back into the water. Juanya followed these instructions and stayed in the shallow end for the remainder of the period. The students vacated the pool at approximately 9:00 a.m. and proceeded to the locker room to change.

A few minutes later, Juanya reported to English class, which began at approximately 9:16 a.m. His teacher reported that he was attentive. Abruptly, at around 10:30 a.m., nearly an hour and a half after he left the pool, Juanya fell backward from a seated position and hit the desk behind him. As he rolled off his chair and onto the floor, he began to have a seizure. Teachers observed labored breath, general unresponsiveness, and a pink, frothy fluid escaping from Juanya's nose and mouth. A school nurse attempted to revive Juanya while they waited for medical assistance. Shortly thereafter, paramedics took Juanya by ambulance to St. Luke's Hospital. He died later that day.

During the course of this litigation, Spady provided an expert medical report opining that Juanya died of a condition known as "delayed drowning," Supp App. 4, or "secondary drowning," which can occur when a small amount of water or other fluid is inhaled into the lungs. If the fluid is not

4

removed, the lungs begin to spasm, causing a build-up of other fluids, which in turn can cause the victim to asphyxiate because the lungs cannot oxygenate the blood. This condition can cause death anywhere from an hour to a day after the initial inhalation of fluid and is extremely rare, accounting for "only 1%-2% of drownings." Supp. App. 83.

In December 2012, Spady filed this civil-rights action against numerous parties, including Rodgers and the BASD, who are the only remaining defendants at this juncture. Spady asserted that the defendants violated Juanya's constitutional rights, triggering liability under 42 U.S.C. § 1983. More specifically, Count II of the complaint alleges a Fourteenth Amendment due-process violation premised on the state-created-danger theory of liability against Rodgers, and Count IV raises a claim of municipal liability against BASD based on a theory of deliberate indifference.

After the close of discovery, Rodgers moved for summary judgment as to Count II, asserting that qualified immunity precluded liability.[3] By Memorandum and Order filed July 30, 2014, the District Court denied the motion for summary judgment, concluding that a genuine dispute of material fact existed as to whether Rodgers violated Juanya's constitutional rights. *Spady*, 2014 WL 3746535 at \*5. The District Court also concluded that because it was unclear "whether a constitutional violation actually occurred," it need not determine whether that right was "clearly established." *Id.* (citing *Curley v. Klem*, 499 F.3d 199, 208, 211 (3d Cir. 2007)). Rodgers timely appealed.

II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), and we have appellate jurisdiction under 28 U.S.C. § 1291 by way of the collateral order doctrine.

---

[3] BASD also moved for summary judgement on Count IV. The District Court denied summary judgement on Count IV and that ruling is not before us.

5

*Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 985 (3d Cir. 2014). "It is well established that an order denying summary judgment on qualified immunity grounds may qualify as an appealable final decision under the collateral order doctrine" where the appeal presents a pure question of law. *Id.* at 986 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526–30 (1985)). "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law[.]" *Elder v. Holloway*, 510 U.S. 510, 516 (1994). Therefore, we have jurisdiction to consider whether the constitutional right at issue was clearly established on December 2, 2010.[4]

---

[4] Seizing upon the following language from *Curley*— "'[i]f, and only if, the court finds a violation of a constitutional right,' the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability," 499 F.3d at 207 (quoting *Scott v. Harris,* 550 U.S. 372 (2007))—Spady argues we lack jurisdiction to consider whether the asserted right was clearly established on December 2, 2010. Spady's argument is without merit. *Curley* neither speaks to our jurisdiction, nor limits it in any manner.

We also take this opportunity to clarify *Curley*, which the District Court cited in declining to reach the "clearly established" prong of the qualified immunity analysis. The process for determining the applicability of qualified immunity discussed in *Curley* was set out in *Saucier v. Katz*, 533 U.S. 194 (2001). Under *Saucier*, courts were required to first decide whether a constitutional violation actually occurred, and only then consider whether the right at issue was clearly established at the time of the violation. *Id.* at 201–202. This rigid system of analysis was overruled by *Pearson v. Callahan*, which provided that courts should "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." 555 U.S. 223, 236 (2009). Under either test, however, the court may not deny a summary judgment

III.

"When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In considering the applicability of qualified immunity, courts engage in a two-pronged examination. First, a court must decide "whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right." *Pearson*, 555 U.S at 232. And second, the court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted). Courts may begin their consideration with either prong. *Id.* at 236.

Here, the District Court began with the first prong and analyzed Spady's constitutional claim under the state-created-danger theory, which is an exception to the general rule that "[t]here is no affirmative right to governmental aid or protection under the Due Process Clause of the Fourteenth Amendment." *Ye v. United States*, 484 F.3d 634, 636 (3d Cir. 2007) (citing *Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)). We adopted this exception in *Kneipp v. Tedder*, where we explained that a plaintiff must show the following:

---

motion premised on qualified immunity without deciding that the right in question was clearly established at the time of the alleged wrongdoing. *See Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) ("[T]he plaintiff bears *the initial burden* of showing that the defendant's conduct violated some *clearly established* statutory or constitutional right." (emphasis added)). That is, while issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue was clearly established. Failure to do so is error.

(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the [harm] to occur.

95 F.3d 1199, 1208 (3d Cir. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995)).  As reflected in the District Court's opinion, the state-created-danger analysis necessitates a fact-intensive inquiry.

*Pearson* recognized, however, that there are instances where a case is most easily resolved by addressing whether the right was clearly established at the time of the alleged violation.  *See* 555 U.S. at 237; *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 176 (3d Cir. 2015).  We conclude this is such a case and will address the second prong of the qualified immunity analysis at the outset.

A.

Before deciding whether the constitutional right Spady relies upon was clearly established, we must first frame the precise contours of that right.  Spady's claim is derived from the Due Process Clause of the Fourteenth Amendment, which reads that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  Spady argues that this case implicates a student's "constitutional right to be free from school officials' deliberate indifference to, or acts that increase the risk of serious injury from unjustified invasions of bodily integrity[.]"  Appellee's Br. at 24 (quoting *Sciotto v. Marple Newton Sch. Dist.*, 81 F. Supp. 2d 559, 570 (E.D. Pa. 1999)).

We are mindful, however, that courts are "not to define clearly established law at a high level of generality." *al-Kidd*, 131 S. Ct. at 2084 (citations omitted). Instead, courts "must define the right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012). Accepting Spady's broad version of the right at issue "would . . . convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). We are thus required to frame the right at issue "in a more particularized, and hence more relevant, sense," *Anderson*, 483 U.S. at 640, "in light of the case's specific context, not as a broad general proposition," *Saucier*, 533 U.S. at 201.

In this case, the specific context is a student who experiences a brief submersion under water, exits the pool and complains of chest pain, is ordered to return to the pool after a several-minute respite, then stays in the shallow end of the pool for the remainder of the class, and does not exhibit signs of serious distress until more than one hour later. The specific constitutional right under the Due Process Clause in this context is the right to affirmative intervention by the state actor to minimize the risk of secondary or dry drowning. And, for qualified immunity purposes, the question is whether the law in this context was so well-established that it would have been apparent to a reasonable gym teacher that failure to take action to assess a non-apparent condition that placed the student in mortal danger violated that student's constitutional right under the state-created-danger theory of liability.

B.

In order for a right to be clearly established there must be applicable precedent from the Supreme Court, which there is not, and even if "'a robust consensus of cases of persuasive authority' in the Court of Appeals 'could itself establish the federal right'" as Spady alleges, there is no such consensus here. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam) (quoting *City & Cnty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1778 (2015)). Although Spady does not have to produce "a case directly on point, . . . existing precedent must

9

have placed the statutory or constitutional question *beyond debate*." *al-Kidd*, 131 S. Ct. at 2083 (citations omitted) (emphasis added). Stated another way, a court need not find that "the very action in question has previously been held unlawful," *Anderson*, 483 U.S. at 640, but rather may conclude that the firmly settled state of the law, established by a forceful body of persuasive precedent, would place a reasonable official on notice that his actions obviously violated a clearly established constitutional right. *Taylor*, 135 S. Ct. at 2044; *al-Kidd*, 131 S. Ct. at 2083.

Turning to the present matter, no Supreme Court case has established a right to adequate safety protocols during public-school swimming class. Indeed, no decision of the Supreme Court even discusses the right of students to have adequate safety protocols in these settings or in any analogous setting. Spady also concedes that our jurisprudence has not recognized a state-created-danger theory on these or similar facts. Nonetheless, Spady argues that our decision in *Kneipp v. Tedder*, and a holding of the Eastern District of Pennsylvania in *Sciotto v. Marple Newton School District*, support her argument that the right at issue was clearly established. We address each case in turn.

The facts of *Kneipp* are not even remotely close to the facts presented here. There, several police officers came upon an intoxicated couple walking home and stopped them for a brief period. 95 F.3d at 1201. The police observed the woman to be drunk—she was having difficulty standing, could not follow simple instructions, and smelled of urine. *Id.* The police officers then sent her male companion home, but continued to detain her for an additional period of time. *Id.* at 1202. The officers later released her from custody to walk home alone, and she fell down an embankment, sustaining serious injuries. *Id.* at 1203. We held that:

> [T]he state-created danger theory is a viable mechanism for establishing a constitutional claim under 42 U.S.C. § 1983. When viewed in the light most favorable to the legal guardians, the

10

evidence submitted was sufficient to raise a triable issue of fact as to whether the police officers affirmatively placed [Kniepp] in a position of danger.

*Id*. at 1211.

The act of separating a visibly intoxicated person from her traveling companion and then forcing her to walk home alone—which necessarily increased the obvious risk that she would fall and injure herself, *id*. at 1209—is far afield from having a student participate in swim class as part of a regular P.E. curriculum. Consequently, it cannot be the case that *Kniepp* put Rodgers, a public school gym teacher, on notice regarding the alleged constitutional violation at issue here.

Spady's reliance on *Sciotto* is equally unavailing. That case involved a wrestling coach who pitted a 16-year-old, 110-pound sophomore wrestler against a 22-year-old, 150-pound former member of a Division I wrestling team. 81 F. Supp. 2d at 561–62. While the two were grappling, the college athlete severely injured the victim's spine, ultimately resulting in quadriplegia. The district court held that "a student's right, in a school setting, to freedom from school officials' deliberate indifference to, or acts that increase the risk of serious injury from unjustified invasions of bodily integrity perpetrated by third parties" was clearly established based on its canvassing of Supreme Court cases and our precedent. *Id*. at 570. *Sciotto* relied principally on *Ingraham v. Wright*, which held "that Fourteenth Amendment liberty interests are implicated" when a school official imposes punishment "by restraining the child and inflicting appreciable physical pain," 430 U.S. 651, 674 (1977),[5] and

---

[5]Although recognizing that various constitutional rights were implicated by corporal punishment in public schools, the Supreme Court held that

> [t]he Eighth Amendment's prohibition against cruel and

*Stoneking v. Bradford Area School District*, where we recognized "a student's right to be free from sexual assaults by his or her teachers," 882 F.2d 720, 727 (3d Cir. 1989).[6]

We do not deny that *Sciotto* and this matter present heart-wrenching circumstances. To equate the intentional infliction of painful corporal punishment or the sexual molestation of a student, however, with a student-athlete's unfortunate accident during wrestling practice or a rare

> unusual punishment is inapplicable to school paddlings, and the Fourteenth Amendment's requirement of procedural due process is satisfied by Florida's preservation of common-law constraints and remedies. We therefore agree with the Court of Appeals . . . that petitioners cannot recover damages on the basis of any Eighth Amendment or procedural due process violation.

*Ingraham*, 430 U.S. at 683.

---

[6] *Sciotto* also relies upon *D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, where we held there was no viable state-created-danger claim when students committed sexual assaults against other students while in school. 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc). Although characterizing it as "an extremely close case," *id.*, we declined to find that failure to properly monitor a classroom, which resulted in students being sexually assaulted, or to report those sexual assaults to the victims' parents or other authorities made out a constitutional violation, *id.* at 1376. Rather than lending support to Spady's position, our reluctance to extend *Stoneking* further illustrates its inapplicability to this matter.

instance of delayed drowning after swim class is a bridge too far. The case law simply did not inform a reasonable gym teacher that the failure to asses a student who briefly goes under water for the possibility of dry drowning violated that student's constitutional right to bodily integrity free from unwarranted intrusions by the state.[7]

Much like *Ingraham* and *Stoneking*, courts that have found colorable constitutional violations in school-athletic settings did so where state actors engaged in patently egregious and intentional misconduct, which is notably absent from this case. For example, in *Neal ex rel. Neal v. Fulton County Board of Education*, the Eleventh Circuit concluded that a student athlete had made out "a violation of his right under the Fourteenth Amendment to be free from excessive corporal punishment," 229 F.3d 1069, 1076 (11th Cir. 2000), after a coach struck the student with a blunt object, knocking out his left eye, *id.* at 1071; *see also Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001) (no qualified immunity where gym teacher picked up a student by his throat and rammed his head into bleachers and a fuse

---

[7] Indeed, when faced with factual scenarios analogous to *Sciotto*—i.e., injuries sustained during school athletic activities—several district courts in this circuit have reached decidedly different conclusions and declined to find a constitutional violation. *See, e.g.*, *Lavella v. Stockhausen*, No. 13-CV-0127, 2013 WL 1838387 (W.D. Pa. May 1, 2013) (dismissing civil rights action premised on state-created danger after previously concussed cheerleader was struck in the head by another cheerleader during practice); *Leonard v. Owen J. Roberts Sch. Dist.*, No. CIV.A.08-2016, 2009 WL 603160 (E.D. Pa. Mar. 5, 2009) (no state-created danger when student was impaled by a javelin thrown by another student); *Yatsko v. Berezwick,* No. 3:06-CV-2480, 2008 WL 2444503, at *6 (M.D. Pa. June 13, 2008) (failing to withhold a concussed student from returning to a basketball game did "not constitute . . . a substantive due process violation"). These cases demonstrate there is no vigorous consensus of authority to support *Sciotto*'s broad holding.

13

box). Such blatantly excessive punishment is far afield from the typical risks that are associated with participation in athletic activities, *see, e.g.*, *Davis v. Carter*, 555 F.3d 979, 984 (11th Cir. 2009) (no constitutional violation stemming from student-athlete's death after rigorous football practice), or even the minimal type of intentional physical contact that, while deplorable, will rarely make out a constitutional violation, *see, e.g.*, *Lillard v. Shelby Cnty. Bd. of Educ.,* 76 F.3d 716, 726 (6th Cir. 1996) ("While we do not mean to suggest that school systems should tolerate a teacher who slaps a student in anger, neither do we conclude that one slap, even if made for no legitimate purpose, rises to the level of a constitutional violation.").

Aside from *Kniepp* and *Sciotto*, Spady has "not brought to our attention"—and we cannot find—"any cases of controlling authority in [any] jurisdiction at the time of the incident which clearly established the rule on which [she] seek[s] to rely, nor [has she] identified a consensus of cases of persuasive authority," *Wilson v. Layne*, 526 U.S. 603, 617 (1999) (modifications added), whereby a reasonable gym teacher would have been aware that his actions were unconstitutional.[8]  Accordingly, we hold that Juanya did not have a clearly established constitutional right to dry-drowning-intervention protocols while participating in P.E. class.[9]  Our conclusion is buttressed by numerous rulings

---

[8] The closest cases to the present matter we have located are *Estate of C.A. v. Castro*, 547 F. App'x 621 (5th Cir. 2013), which involved the drowning death of a student during a science experiment, and *Langan ex rel. Langan v. Grand Rapids Public School System*, No. 94-CV-174, 1995 WL 17009502 (W.D. Mich. Feb. 28, 1995), which concerned a student who suffered a neck injury after diving into the shallow end of a school's pool.  Both courts concluded that the plaintiffs failed to make out a constitutional claim.  *C.A.*, 547 F. App'x at 625; *Langan*, 1995 WL 17009502, at *4. Thus, they do not support Spady's position.

[9] Spady points to a host of safety measures that her aquatic expert claims should have been implemented and,

from other courts that address injuries caused by public-school teachers. *See, e.g.*, *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373, 1378–79 (11th Cir. 2002) (no viable constitutional claim where student died after touching exposed high-voltage wire during science experiment); *Voorhies v. Conroe Ind. Sch. Dist.*, 610 F. Supp. 868, 873 (S.D. Tex. 1985) (no constitutional claim where shop teacher removed safety guard on a power saw causing student to severely lacerate hand).

Our holding is also in accord with the traditional limits of the Fourteenth Amendment. As observed in *DeShaney*:

> The [Due Process] Clause is phrased as a limitation on the State's power to act, *not as a guarantee of certain minimal levels of safety and security*. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language *cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means*.

489 U.S. at 195 (emphasis added). "[H]ard as our sympathies may pull us, our duty to maintain the integrity of substantive

---

potentially, could have averted this tragedy. Even assuming Rodgers was charged with implementing these measures—rather than the BASD—this argument does nothing to change our conclusion that Rodgers is entitled to qualified immunity. *See Sheehan*, 135 S. Ct. at 1777 ("[A] plaintiff cannot 'avoi[d] summary judgment by simply producing an expert's report'" opining that the state actor's conduct "was imprudent, inappropriate, or even reckless." (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002))).

15

law pulls harder." *Turner v. Atl. Coast Line R.R. Co.*, 292 F.2d 586, 589 (5th Cir. 1961).

## IV.

For the aforementioned reasons, we will reverse the District Court's Order of July 30, 2014, denying Rodgers's motion for summary judgment.