**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2821
_____

KENNETH MANN,
as parents and co plenary guardians of
the estate of SHELDON MANN, an
incapacitated person, and in their own right;
ROSE MANN, as parents and co plenary
guardians of the estate of SHELDON MANN,
an incapacitated person, and in their own right,
                                                   Appellants
                              v.

PALMERTON AREA SCHOOL DISTRICT;
CHRISTOPHER WALKOWIAK, individually and in his
official capacity as a football coach
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 3-14-cv-00068)
District Judge: Hon. A. Richard Caputo
_____

Argued April 27, 2017
_____

Before: MCKEE, VANASKIE, and RENDELL, *Circuit Judges*

(Opinion Filed: September 21, 2017)

Howard J. Bashman, Esq.    [Argued]
Law Offices of Howard J. Bashman
2300 Computer Avenue
Suite G-22
Willow Grove, PA 19090

Larry E. Bendesky, Esq.
Adam J. Pantano, Esq.
Robert W. Zimmerman, Esq.
Saltz Mongeluzzi Barrett & Bendesky
1650 Market Street
One Liberty Place, 52nd Floor
Philadelphia, PA 19103

    *Counsel for Appellants Kenneth Mann and Rose Mann*


Thomas A. Specht, Esq.    [Argued]
Robin B. Snyder, Esq.
Marshall Dennehey Warner Coleman & Goggin
P.O. Box 3118
Scranton, PA 18505
    *Counsel for Appellees Palmerton Area School District and Christopher Walkowiak*
                    _____

OPINION OF THE COURT

_____

VANASKIE, *Circuit Judge*

In November of 2011 Sheldon Mann, a football player for the Palmerton Area School District, experienced a hard hit during a practice session. While some players thought that Sheldon may have been exhibiting concussion-like symptoms, he was sent back into the practice session by his Coach, Appellee Chris Walkowiak. After being returned to practice, Sheldon suffered another violent collision and was removed from the practice field. He would later be diagnosed with a traumatic brain injury. In bringing a lawsuit against Palmerton Area and Walkowiak, Sheldon's parents asserted that by requiring Sheldon to continue to practice after sustaining the first substantial blow, Walkowiak had violated Sheldon's constitutional right to bodily integrity under a state-created danger theory of liability. Also, Palmerton Area, the Manns alleged, was accountable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). The District Court ruled in favor of Walkowiak and Palmerton Area on summary judgment, finding that, while there was ample evidence to suggest that Walkowiak was culpable under a state-created danger theory of liability, a constitutional right to protection in the context presented here was not clearly established in 2011. Accordingly, the District Court granted Walkowiak qualified immunity and dismissed him from the lawsuit on that basis. As to Palmerton Area, the District Court found that the Manns had failed to present evidence sufficient to warrant a jury trial on the question of whether the school district had a custom or policy that caused a violation of Sheldon's constitutional rights. Accordingly, the District Court entered judgment in favor of Palmerton Area.

We agree with the District Court's conclusions pertaining to the claims against the football coach: Walkowiak's alleged conduct, if proven at trial, would be sufficient to support a jury verdict in favor of Mann on his state-created danger claim, but the right in question—to be free from deliberate exposure to a traumatic brain injury after exhibiting signs of a concussion in the context of a violent contact sport—was not clearly established in 2011. Accordingly, the District Court correctly ruled that Coach Walkowiak was entitled to qualified immunity. We also agree with the District Court that the Manns did not present sufficient evidence to warrant a jury trial on the *Monell* claim against Palmerton Area. We will therefore affirm the District Court's grant of summary judgment.

**I.**

Sheldon Mann was a student at Palmerton Area High School and had participated in its football program starting in July of 2008. Beginning in 2006, Walkowiak was a team coach and in 2011 was promoted to Head Coach. After being named Head Coach, Walkowiak received concussion and safety training at DeSales University. Because of this training he was aware of the signs and symptoms of a concussion.

On November 1, 2011, Sheldon, then a 17 year-old senior, was participating in practice and sustained a hard hit to his upper body area while playing the outside linebacker position as part of the "scout" team against the varsity starting team.[1] Walkowiak claims he did not see the hit, but did

---

[1] The role of a "scout" team in football practice is to play the role of the opposing team for the school's next game, with the

4

observed Sheldon "rolling" his shoulder. (JA 509.) Walkowiak testified at his deposition that he asked Sheldon if "he was all right," to which Sheldon replied, "I'm fine," and Sheldon continued to participate in the practice session.[2] (*Id.*)

starting team running plays against anticipated formation of the opposing team. In this case, Sheldon was playing against the Palmerton Area's starting offensive team as they prepared for their upcoming game against Northern Lehigh High School.

[2] Walkowiak indicated that the first hit may have produced something like a shoulder "stinger," which he acknowledged can be "a symptom of [a concussion], depending on where you were hit." (JA 1592, 1599). According to the University of Rochester Medical Center online "Health Encyclopedia:"

> Stingers occur when the shoulder and head go in opposite directions, the head is moved quickly to one side, or the area above the collarbone is hit. The injury occurs when a spinal nerve in the neck is compressed as the head accelerates backward and the neck is forced toward the affected side. Stingers may also be caused when the head accelerates sideways, away from the shoulder, which overstretches the nerves in the neck and shoulder region.

University of Rochester Medical Center, Health Encyclopedia, *Put a Stop to Nerve Injuries Called Stingers* (2017), https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=1&contentid=2817 (last visited Aug. 24, 2017).

In multiple depositions, Sheldon's teammates testified that they believed Sheldon was suffering from a concussion after this hit and were surprised that he was allowed to continue to practice. One teammate even testified that it was one of the "bigger hits" he had ever seen. (JA 1657.) Another teammate testified that after the first hit, Sheldon looked as though he was dizzy and was stumbling around the field, symptoms that this teammate believed to be associated with a concussion. And while not explicitly stating that they believed that Sheldon Mann was suffering from a concussion, other coaches testified that they were aware of the symptoms of a concussion and that standard procedure was to remove a student suffering from concussion-like symptoms from practice and have him seen by a trainer.

Approximately twenty plays after Walkowiak observed Sheldon rolling his shoulder, Sheldon sustained a second hard hit to the upper body area. Walkowiak walked over to Sheldon to ascertain his condition. Sheldon told Walkowiak that "it was the hardest hit he received in playing football." (JA 550). After this second hit, Sheldon was removed from the practice field. Practice ended about 10 minutes later, and Walkowiak then accompanied Sheldon to the trainer's room.

At the time of this incident, Palmerton Area had in place a series of policies and procedures outlined in its 2011-2012 Athletic Handbook. The Handbook required that any player suffering from injury or illness be excluded from participation in the sport until cleared by a physician, and explicitly stated that a student suspected to be injured must be removed from play and sent to the athletic trainer.

As a result of the violent hits Sheldon sustained on November 1, 2011, he suffered a traumatic brain injury and his parents have been appointed his guardians. The Manns brought this lawsuit, asserting that Palmerton Area and Walkowiak (together "Appellees") had deprived Sheldon of this constitutionally-protected right to bodily integrity. Specifically, they argued that Sheldon's constitutional rights were violated as a result of Walkowiak's exercise of authority in telling Sheldon to continue participating in football practice after sustaining a hit and exhibiting signs of a concussion. Plaintiffs also claimed that Sheldon's constitutional rights were violated as a result of Palmerton Area's failure to assure that injured student-athletes were medically cleared to resume participation in the sport, failure to enforce and enact proper concussion policies, and failure to train the coaches on a safety protocol for head injuries. The parties engaged in discovery, and on February 1, 2016, Appellees moved for summary judgment, arguing that there was insufficient evidence to establish a state-created danger claim against Walkowiak and a municipal liability claim against Palmerton Area. Walkowiak also asserted a right to qualified immunity. On June 2, 2016, the District Court granted summary judgment in favor of defendants Walkowiak and Palmerton Area. This appeal followed.

## II.

The District Court possessed subject–matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343. We exercise jurisdiction over this appeal pursuant to 28 U.S.C. §1291. Our review of an order granting summary judgment is plenary. *Curley v. Klem*, 298 F.3d 271, 276 (3d Cir. 2002). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file,

7

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).

## III.

State actors sued in their individual capacity under Section 1983 are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a qualified immunity defense is asserted, a court must determine (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the injury. *Yarris v. Cty. of Del.*, 465 F.3d 129, 140-41 (3d Cir. 2006) (internal citation omitted). In this case, the District Court determined that the first prong of the qualified immunity inquiry was satisfied: the Manns had presented sufficient evidence to warrant a jury trial on the question of whether Walkowiak had violated Sheldon's constitutional rights. It is to this part of the qualified immunity test that we first turn our attention.

## A.

The Manns' state-created danger claim derives from the Fourteenth Amendment Due Process Clause, which provides that "[n]o state shall . . . deprive any person of life, liberty, or property without due process of law[.]" U.S. Const. amend XIV, § 1. We have recognized a successful state-created danger claim when a plaintiff pleads that

8

> (1) the harm ultimately caused [by the state actor's conduct] was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and footnotes omitted).

The first element of a state-created danger claim requires plaintiffs to establish that the harm sustained as a result of the defendant's conduct was "foreseeable and fairly direct." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008). More specifically, this "require[s] a plaintiff to allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Id.* at 238.

In his deposition, Walkowiak testified that he was aware of the symptoms of a concussion and had been trained in how to identify one. Walkowiak also testified that he was trained to err on the side of caution when it came to removing players who may be suffering concussion-like symptoms.

9

After Sheldon experienced the first hit, Walkowiak admitted that Sheldon's hit could have been characterized as a "stinger" and that this could be a symptom of a concussion. (JA 1592; 1599).

The District Court held that this evidence would be sufficient to support a jury finding that "Sheldon's injury was a 'foreseeable and fairly direct' harm" of being allowed to continue to practice after sustaining the first big hit. *Mann v. Palmerton Area Sch. Dist.*, 189 F. Supp. 3d 467, 475 (M.D. Pa. 2016). We agree.

The District Court also held that the Manns had satisfied the second element of the state-created danger test— that Walkowiak acted with a degree of culpability that shocked the conscience. We have observed that "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Estate of Smith v. Marasco,* 430 F.3d 140, 153 (3d Cir. 2005) (*quoting Miller v. City of Philadelphia,* 174 F.3d 368, 375 (3d Cir. 1999)). If the circumstances are highly pressurized, it is necessary to show intentional harm by the state actor; however, if the state actor has the benefit of deliberation, then all the plaintiff needs to show is deliberate indifference. *Id.* Moreover, in cases "involving something less urgent than a 'split-second' decision but more urgent than an 'unhurried judgment,'" the relevant inquiry is whether the state actor "consciously disregarded a great risk of harm," with the possibility that "actual knowledge of the risk may not be necessary where the risk is 'obvious.'" *Sanford v. Stiles,* 456 F.3d 298, 310 (3d Cir. 2006).

The District Court correctly concluded that there was no indication that this was a highly pressurized environment

10

for which a showing of intent to harm would be necessary. Instead, the Manns only needed to prove deliberate indifference to the safety of a player in the circumstances presented here to satisfy the conscience-shocking element of their claim. (JA 12).

In Walkowiak's deposition testimony, he stated that he observed Sheldon as exhibiting the signs of a possible "stinger," a term that he acknowledged is associated with a concussion. He also testified, however, that he assumed the hit was not a substantial one because he did not actually see it. Contradicting Walkowiak's testimony is the testimony of an assistant coach, who, although absent from practice the day that Sheldon was injured, stated that Walkowiak told him that Sheldon experienced two hard hits. Walkowiak's boss, Athletic Director Andrew Remsing, also testified that Walkowiak could be considered to have failed to follow school policy for injuries by allowing Sheldon to remain if he was suffering concussive symptoms. Finally, the Manns presented testimony through other players that after Sheldon was first hit, Walkowiak instructed him to continue practicing. Although Walkowiak disclaimed knowledge of the first big hit, the Manns adduced sufficient evidence to call this disclaimer into doubt. Thus, for the purposes of the summary judgment ruling, it was appropriate to infer that that Walkowiak was aware that Sheldon had sustained a substantial blow and exhibited signs consistent with having sustained a concussion. Under these circumstances, a jury could find that, by failing to remove Sheldon from play and requiring him to continue to practice, Walkowiak was deliberately indifferent to the risk posed by sustaining a second substantial blow to the head.

To establish the third element of a state-created danger claim the Manns were required to prove that "a

11

relationship between the state and [Sheldon] existed such that [Sheldon] was a foreseeable victim of the defendant's acts." *Sanford*, 456 F.3d at 304. This element was not challenged by Appellees. The bar for proving this element is not terribly high, as we have previously held that a relationship can exist where a plaintiff is a member of a group that is subject to potential harm brought about by the state's actions. *Philips v. Cty. of Allegheny,* 515 F.3d 224, 242 (3d Cir. 2008). It is clear that a student-athlete stands in such a relationship with the coaching staff.

The final element of a state-created danger claim requires a showing that Walkowiak affirmatively used his authority in a way that created a danger to Sheldon or rendered him more vulnerable to danger. *Bright*, 443 F.3d at 281. The parties dispute whether Walkowiak took an affirmative act that put Sheldon in danger or made him more vulnerable to risk, but we find the District Court again to be correct in assessing that a reasonable juror could find this element of Sheldon's claim was also satisfied. If a jury concluded that Walkowiak was aware of the first blow to Sheldon's head and observed signs of a concussion, the jury could conclude that Walkowiak used his authority in a way that rendered Sheldon more vulnerable to harm by sending him back into the practice session.

In summary, we hold that there exists a relationship between a student-athlete and coach at a state-sponsored school such that the coach may be held liable where the coach requires a player, showing signs of a concussion, to continue to be exposed to violent hits. Stated otherwise, we hold that an injured student-athlete participating in a contact sport has a constitutional right to be protected from further harm, and that a state actor violates this right when the injured student-athlete is required to be exposed to a risk of harm by continuing to

practice or compete.  We now turn to the difficult question of whether this right was clearly established in November of 2011.

**B.**

Clearly established law for purposes of qualified immunity means that

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Wilson v. Layne*, 526 U.S. 603, 615 (1999).  In addressing the clearly established prong of the qualified immunity inquiry, we must define the right allegedly violated at the appropriate level of specificity.  *Sharp v. Johnson,* 669 F.3d 144, 159 (3d Cir. 2012) (internal quotations omitted).  As we explained in *Spady v. Bethlehem Area School District,* 800 F.3d 633, 638 (3d Cir. 2015), we must "frame the right at issue in a more particularized, and hence more relevant, sense, in light of the case's specific context, not as a broad general proposition." (Internal quotations omitted.)

In *Spady*, a child suffered "dry drowning" after participating in a mandatory swim class run by the gym teacher. *Id.* at 635. We granted qualified immunity to the gym teacher, concluding that a child did not have a clearly established right to dry-drowning intervention protocols while

13

participating in gym class. *Id*. at 641. In arriving at this conclusion, we observed that the dangers of dry drowning were not so well known and obvious that a swim teacher should be expected to take extra precautions to guard against this rare phenomenon. *Id.*

In this case, the specific context is a football player fully clothed in protective gear, including a helmet, who experiences a violent blow, shows signs of a concussion, and is required to continue to engage in the same activity that caused the first substantial hit. We are aware of no appellate case decided prior to November of 2011 that held that a coach violates the student's constitutional rights by requiring the student to continue to play in these circumstances.

Our conclusion in *Spady* rested on the fact that "courts that have found colorable constitutional violations in school-athletic settings did so where state actors engaged in patently egregious and intentional misconduct." 800 F.3d at 641. *Compare Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.* 229 F.3d 1069, 1076 (11th Cir. 2000) (holding that a student athlete had made out "a violation of his right under the Fourteenth Amendment to be free from excessive corporal punishment," after being hit with a blunt object by his coach) *and Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 252 (2d Cir. 2001) (no qualified immunity where gym teacher picked up a student by his throat and rammed his head into bleachers and a fuse box); *with Davis v. Carter,* 555 F.3d 979, 984 (11th Cir. 2009) (no constitutional violation stemming from student-athlete's death after rigorous football practice). No case has been called to our attention where a state-created danger was established after a student-athlete was required to continue to compete after sustaining a substantial hit, the results of which were observed by the coach and could

14

potentially signal a head injury, yet where the student-athlete told the coach that he was fine to continue to play, all of which is the evidence in this case. And while not binding, we similarly held as recently as 2013 in a non-precedential opinion that a cheerleader who suffered a serious injury due to a coach's decision to try out a new stunt without proper protective matting in place, did not violate a clearly established right held by the athlete. *See Hinterberger v. Iroquois Sch. Dist.*, 548 F. App'x 50, 54 (3d Cir. 2013).

The Manns rely heavily on *L.R. v. School District of Philadelphia*, 836 F.3d 235 (3d Cir. 2016). That case presented the question of whether a kindergarten teacher who released a student to a stranger who then sexually abused the child was entitled to qualified immunity. *Id*. at 239-240. We reasoned that the teacher was not entitled to qualified immunity because the right in question—"an individual's right not to be removed from a safe environment and placed into one in which it is clear that harm is likely to occur, particularly when the individual may, due to youth or other factors, be especially vulnerable to the risk of harm"—was clearly established at the time of the incident. *Id*. at 249. The Manns maintain that this same right is at issue in the case at hand. And while *L.R*. dealt with an incident that occurred in January of 2013, we relied on precedent that predated November of 2011. Specifically, *L.R*. relied heavily on our 1996 decision in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), which involved a police officer abandoning a plainly inebriated woman on her walk home who then passed out and suffered a serious injury. *Id*. at 1203.

*Kneipp* and *L.R*. are not dispositive here. *L.R*. established liability based on the fact that the risk of harm to the child would be patently obvious to any adult in that situation. Allowing a kindergartener to leave the classroom

15

with a stranger plainly exposed the vulnerable kindergartener to a substantial risk of grievous harm. Similarly, *Kneipp* dealt with a similarly vulnerable woman who was so inebriated that she could not even stand or follow simple instructions. Not only did the police officer detain her and send her male companion away, but the officer himself then abandoned her so that she had to walk home alone. *Id.* at 1201-03. Again, the risk of harm in abandoning someone who is clearly exhibiting signs of a physical impairment like severe inebriation demonstrates such deliberate indifference to the unsafe situation created by the state actor that imposing liability on the state actor is appropriate.

By way of contrast, in November of 2011 it was not so plainly obvious that that requiring a student-athlete, fully clothed in protective gear, to continue to participate in practice after sustaining a violent hit and exhibiting concussion symptoms implicated the student athlete's constitutional rights. The touchstone of qualified immunity analysis is whether there was "sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (*quoting McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)). We look first to the Supreme Court's cases. Even if support is lacking there, a "robust consensus of cases of persuasive authority in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity." *L.R.*, 836 F.3d at 248 (*quoting Mammaro*, 814 F.3d at 169)). Here, no case from this Court or any of our sister Courts of Appeals, let alone a Supreme Court case, has applied the principles we elucidated in *L.R.* and *Kneipp* to the school athletic context. We therefore

16

agree with the District Court that the right at issue here was not clearly established in November of 2011.

"When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. Al-Kidd,* 563 U.S. 731, 743 (2011) (*quoting Malley v. Briggs,* 475 U.S. 335, 341 (1986)). Given the state of the law in 2011, it cannot be said that Walkowiak was "plainly incompetent" in sending Sheldon in to continue to practice after he saw Sheldon rolling his shoulder and being told by Sheldon, "I'm fine." (JA 509). Nor is there any basis for concluding that he knowingly violated Sheldon's constitutional rights. Accordingly, we will affirm the District Court's qualified immunity ruling.

## IV.

Finally, we must address the Manns' *Monell* claim against Palmerton Area. Local governments, such as school districts, cannot be held liable under §1983 for the acts of their employees. Instead, local governments may be found liable under §1983 for "their own illegal acts." *Connick v. Thompson,* 563 U.S. 51, 60 (2011). A municipality is liable under §1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation.

The Manns argue that coaches were not adequately trained on concussion recognition and protection, and had they been, Sheldon may not have suffered his severe injury. Specifically, they argue that the school's generic handbook for dealing with injured student-athletes failed to provide a protocol for dealing specifically with concussions. They submit national news articles from 2011 that reported on the

17

risk of concussions in football as well as manuals from neighboring school districts that had implemented concussion policies as of November 2011. They also rely on *Thomas v. Cumberland County*, 749 F.3d 217, 219 (3d Cir. 2014), in which we assessed the significance of an expert's report establishing the need for training corrections officers to address and avoid inmate–on–inmate violence. We held that because the evidence showed that the municipality failed to train its employees to handle recurring acts of violence, the District Court should not have precluded the factual issues from going to a jury. *Id*. at 225-26. Unlike *Thomas*, the Manns cite no evidence that would suggest deliberate indifference to a pattern of recurring injuries. *See Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) ("Failure to . . . train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations"). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick,* 563 U.S. at 62.

In this case there is no evidence of a pattern of recurring head injuries in the Palmerton Area football program. Nor is there evidence that Walkowiak or any other member of the coaching staff deliberately exposed injured players to the continuing risk of harm that playing football poses. In the context of the *Monell* claim, it is also significant that the Pennsylvania General Assembly did not pass legislation that mandated training for coaches to prevent concussions until November 9, 2011, and the legislation did not even go into effect until July of 2012. *See* Safety in Youth Sports Act, 24 Pa. Cons. Stat. §§ 5321–5323. Under these circumstances

18

there is no basis for concluding that a policy or custom of Palmerton Area or its failure to provide more intense concussion training to its coaches caused a violation of Sheldon's constitutional rights.

## V.

For the foregoing reasons we will affirm the District Court's order, entered June 2, 2016, granting summary judgment in favor of Walkowiak and Palmerton Area.